UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

UNITED STATES OF AMERICA,        )
                                 )
v.                               )        Case No. 1:14-cr-94
                                 )        *Mattice/Carter*
DAVID BROGLIN                    )

REPORT AND RECOMMENDATION

I. Introduction

Defendant's motion to suppress statement [Doc. 17] and motion to suppress the search of his residence [Doc. 18] are before the undersigned having been referred for a report and recommendation by the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).   Broglin, who is charged with being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1), contends ammunition, firearms and other potentially incriminating evidence found in in his home should be suppressed as evidence against him because police entered the apartment in violation of his Fourth Amendment rights because the information in the search warrant affidavit was stale and there was no nexus between the criminal activity and his home.  He also seeks suppression of statements he made to police concerning the firearms and ammunition on the ground that when his statements were made, he did not knowingly, intelligently and voluntarily waive his Miranda rights and did not knowingly waive his right to counsel.  I conclude the information in the search warrant affidavit was not stale and that there was a sufficient nexus to his residence.  I further find, from the totality of the circumstances, that Broglin received proper Miranda warnings and knowingly and intelligently waived those rights.  Accordingly, I RECOMMEND defendant's motion to suppress be DENIED.

## II. Relevant Facts

The Fourth Amendment issue related to the search of the home must be resolved on the basis of the facts found in the four corners of the search warrant affidavit.

On July 3, 2014, Special Agent Shawn W. Ready with the United States Department of Agriculture, Forest Service ("USDAFS") obtained a federal search warrant for Broglin's residence, which is located at 266 Hawkins Drive in Ocoee, Polk County, Tennessee. Broglin is a convicted felon. The scope of the search warrant covered firearms and related items. The affidavit submitted in support of the search warrant provides, in relevant part, as follows:

I.      Introduction

Your affiant, Special Agent Shawn W. Ready with the United States Department of Agriculture, Forest Service, being duly sworn according to the law, deposes and says:

This affidavit seeks authorization for a search and seizure warrant for the following location and asserts that there is probable cause to believe that the location contains evidence, fruits and instrumentalities, or violations of the firearm laws of the United States, to wit possession of a firearm by a convicted felon, under 18 USC section 922(g)(1).

A.      Eastern District of Tennessee - Search and Seizure Warrant

I, Shawn W. Ready, with the USDA-Forest Service, have been employed as a Federal Law Enforcement Officer for more than 11 years. The affiant's responsibilities include the investigation of alleged criminal violations of the United States Code including Titles 18 and 21.

II.      Introduction of the Affiant

Special Agent Ready has been a sworn law enforcement officer for over 11 years and is currently a Special Agent with the USDA-Forest Service Law Enforcement and Investigations Division. Special Agent Ready's present post of duty is the Cherokee National Forest, Eastern Judicial District of Tennessee and is assigned as a Criminal Investigator based in Cleveland, Tennessee. During his career as a federal law enforcement officer, Agent Ready has attended the Federal Law Enforcement Training Center in Glynco, Georgia, both in the Basic Police Training Program and also the Criminal Investigator Training Program. Both of these training programs included training with regards to federal firearms

violations under Title 18 of the United States Code. Agent Ready has also attended the Drug Enforcement Administration's forty-hour Title 21 Counter Narcotics training course where he received specialized training in the detection of controlled substances, the execution of search warrants, and criminal investigations. Agent Ready has been involved in the execution of numerous search warrants and various cases involving violations of controlled substance laws that involved firearms-related investigations. Agent Ready is responsible for conducting investigations assigned to him and oversight of all felony and serious misdemeanor cases investigated by the USDA Forest Service within his geographical area of responsibility.

III.     Records, Retention, and Experience

Based upon the affiant's knowledge, training, experience, and participation in investigations involving firearms, and through consultation with other experienced investigators, I know or have reason to believe the following:

a.       That most people who have firearms store them in their homes, and that most federal Circuit Courts of Appeal have held that it is reasonable to believe that persons normally store their firearms in their homes, and that persons who possess firearms usually possess other items related to firearms, such as gun cases, ammunition magazines, holsters, spare parts, cleaning equipment, literature relating to firearms, photographs of firearms and receipts for the purchase of these items;

b.       That persons possess on their person, in their residences, and in/on other real property and vehicles over which they have dominion and control, documents which indicate their occupancy and/or ownership, such as personal mail, receipts, checkbooks, personal identification documents, notes and other correspondence, utility bills, financial documents, keys, photographs, leases, mortgage bills, vehicle registration information, ownership warranties, telephone answering machine introductions, and photographs;

c.       That when determining whether a delay in obtaining a search warrant makes affidavit information fatally stale, courts look not only to the length of the delay, but also to such things as the nature of the criminal activity involved (whether continuous and ongoing or infrequent) and the kind of property that is to be searched for (whether perishable or enduring);

d.       That firearms are not perishable, quickly consumed, or readily destroyed and do not lend themselves as well to rapid disposition, but are instead of a continuing nature, have an enduring utility to their holders, and their possession is typically constant and ongoing, often remaining in one person's possession for a long length of time, and therefore the unlawful possession of firearms is typically an ongoing offense;

e.      That individuals who engage in the unlawful possession of firearms often take, or cause to be taken, photographs or videos of themselves with such items, and normally keep these photographs and videos in their possession, in their residence, vehicles, and/or in their place of business.

IV.     Probable Cause

The information in this affidavit is based on my personal knowledge and information provided to me by other law enforcement officers. The information in this affidavit is provided for the limited purpose of establishing probable cause. The information is not a complete statement of all the facts related to this case.

1.      In March of 2013, the opening day of turkey season, Forest Service Law Enforcement Officer Philip Earhart made contact with David Broglin on the South Cherokee Wildlife Management Area. Officer Earhart observed that Broglin was alone and wearing camouflage. Officer Earhart asked Broglin if he was turkey hunting and he replied that he was. Officer Earhart observed a 12 gauge pump shotgun in the front seat of the white Toyota pickup truck he was driving. Officer Earhart asked to see his hunting license and to check to make sure that the weapon was not loaded, which is prohibited by state law. Officer Earhart physically picked up the shot gun and manipulated the action and confirmed the shotgun was clear. Broglin provided Officer Earhart with a valid hunting license, and Officer Earhart continued on patrol.

2.      On January 4, 2014, Officer Earhart set up an approved compliance checkpoint at the intersection of Baker Creek Road and Sylco Road on the South Cherokee Wildlife Management Area. Tennessee Wildlife Officers Sergeant Ben Davis, Brandon Wear, and Andrew Ward assisted Officer Earhart on the checkpoint. David Broglin was contacted driving a white Toyota pickup truck. Broglin provided Officer Earhart with the requested driver's license, vehicle registration, and proof of insurance. Officer Earhart observed that he had a Ruger 10/22 semi-automatic rifle in the front passenger seat of the vehicle along with an aftermarket high capacity magazine in the front seat. Broglin was alone in the vehicle. Broglin was asked if he had any other weapons in the vehicle based on the fact that a .22 rifle is the only firearm legal for the raccoon hunt, and he replied that was the only gun he had. Officer Earhart stated he had not seen him since turkey season, and Broglin acknowledged that fact to be correct. Officer Wear opened the passenger door to the truck and manipulated the action on the weapon to ensure that it was not loaded. It is a violation of state law to transport a loaded weapon on a Wildlife Management Area. Broglin stated he was raccoon hunting that evening and was then asked by Officer Earhart for a hunting license, which he provided.

3.      On January 11, 2014, Tennessee Wildlife Officer Brandon Wear was patrolling the South Cherokee Wildlife Management Area checking hunters for compliance during an open raccoon hunt. Officer Wear contacted David Broglin

4

parked in his Toyota pickup truck at the end of Pace Gap Road. Broglin stated he was raccoon hunting that night and that he had killed one raccoon. Upon further inspection, Officer Wear observed a dead raccoon on the top of the dog box in the back of his truck. Officer Wear also observed a Ruger 10/22 in the front passenger seat of the Toyota truck.

4.      On January 31, 2014, Officer Earhart was on patrol near Jack's River when he contacted a hunter. The hunter stated he was legally squirrel hunting in Georgia and had come across the state line to retrieve his dogs. The hunter advised Officer Earhart that another hunter, David Broglin had taken part in the illegal take of a wild hog in the Ocoee Bear Reserve in the past 48 hours. The hunter stated that he had seen a picture of the wild hog harvested in the snow on a friend's cell phone. The hunter stated that his unnamed friend had received the picture from David Broglin on his cell phone.

Officer Earhart contacted Tennessee Wildlife Officer Sergeant Ben Davis in reference to the information and completed an incident report. While utilizing the TN integrated Criminal Justice Portal to verify Broglin's personal information for the incident report, Officer Earhart observed that David Broglin had a TOMIS history listing two violent felony offenses. Officer Earhart requested a criminal history on David J. Broglin (DOB 04/21/1978) from Forest Service Intelligence Analyst Wycliffe Jandharrie and observed that Broglin had been convicted of multiple felonies.

Officer Earhart visited the Hamilton County Criminal Court and the Bradley County Criminal Court and obtained certified copies of the felony convictions for David J. Broglin:

| State Case No. | Charge | Date of Conviction |
| --- | --- | --- |
| S97-150 Ct. 1 | Burglary/Class D | 07/08/1997 |
| S97-150 Ct. 3 | Burglary/Class C | 07/08/1997 |
| S97-150 Ct. 6 | Vandalism/Class D | 07/08/1997 |
| S97-150 Ct. 8 | Vandalism/Class D | 07/08/1997 |
| S97-150 Ct. 9 | Vandalism/Class D | 07/08/1997 |
| S97-150 Ct. 10 | Vandalism/Class D | 07/08/1997 |
| S97-150 Ct. 14 | Vandalism/Class E | 07/08/1997 |
| S97-150 Ct. 17 | Vandalism/Class D | 07/08/1997 |

5

| S218417 | Burglary/Class D | 12/19/1997 |
| S218420 | Burglary/Class D | 12/19/1997 |

**5.      On June 27, 2014, your affiant received information from Officer Earhart that Wildlife Officer, Sergeant Ben Davis was downloading video from his personal video recording camera and observed footage from the January 4, 2014, checkpoint on the South Cherokee Wildlife Management Area of the contact with David Broglin.  This newly retrieved video displayed Broglin being contacted by Officer Earhart and confirming that he was hunting with a Ruger 10/22 alone during a Raccoon hunt.**

6.      On June 30, 2014, your affiant traveled to the Tennessee Wildlife Resources Work Center in Calhoun, TN and met with Officer Earhart, Tennessee Wildlife Officers Lt. Jeff Bishop, and Officer Wear. Lt. Bishop accessed the Remote Easy Access Licensing (REAL) database that manages all of their records for hunting, fishing, boat registration, etc.  David Broglin's name was quarried and he was listed in the system with a TWRA ID # 566510319.  It listed that a Resident Sportsman license was processed on March 6, 2014, and he registered a boat **on June 26, 2014.  The current address he gave was 266 Hawkins Drive, Ocoee, Tennessee 37361.**

7.      On July 1, 2014, your affiant traveled to 266 Hawkins Drive, Ocoee, Tennessee, and observed a white Toyota pickup truck with a Tennessee registration plate of 077YSM and a red GMC Sierra pickup truck with a Tennessee registration plate of 304PTM in the driveway.  Your affiant accessed the Tennessee integrated Criminal Justice Portal confirming that both vehicles were registered to David J. Broglin of 266 Hawkins Drive, Ocoee, Tennessee 37361.

V.      Description of Property to be Searched

In the Eastern Judicial District of Tennessee:

A.      The residential dwelling, outbuildings, and property of David J. Broglin, is located at 266 Hawkins Drive, Polk County, in the Eastern Judicial District of Tennessee.  The residence is more particularly described in Attachment A of the search warrant application and on the search warrant.

An evidentiary hearing was held on defendant's motion to suppress statement on March 19, 2015. Three witnesses testified: Officer Phillip Earhart, Amanda Broglin and the defendant David Broglin. The following information is derived from that hearing:

On July 10, 2014, Agent Ready and several other law enforcement officers executed the search warrant at Defendant's residence. Agent Phillip Earhart, a U.S. Forest Service Law Enforcement Officer, testified at the March 19, 2015 hearing. He testified to the following: He was present at the search. He and other officers arrived at about 7:00 am. Broglin's wife, Amanda Broglin, opened the front porch door and let them in. The entry into Broglin's residence was not forced. Broglin was still asleep in his bedroom at the time. Broglin was escorted to the living room of his residence, at which time Agent Ready advised Broglin who he was and why he was there. Broglin was then placed in handcuffs for officer safety. He was handcuffed with his hands in front of him for his comfort. He was then escorted to an unmarked Forest Service vehicle, a Chevy Tahoe, parked in the driveway of his residence.

While other officers were executing the search warrant, Forest Service Officer Philip Earhart interviewed Broglin in the Chevy Tahoe. The interview started at approximately 20 minutes after his arrival or at about 7:20 am. Broglin remained in handcuffs for the duration of the interview. Broglin sat in the back of the vehicle and Officer Earhart sat in the front of the vehicle. The Chevy Tahoe did not have a "cage" separating the rear of the vehicle from the front in order to permit the transport of prisoners. At no point prior to or during the interview did Officer Earhart display his weapon or raise his voice.

Prior to the interview, Officer Earhart advised Broglin of his Miranda rights and asked him if he understood them, after which Broglin told him he understood his rights and agreed to

speak with him. Officer Earhart testified he read the entire form word for word including the separate waiver of rights portion of the form. Broglin, who was 36 years old at the time and familiar with the criminal justice system,[1] executed a written Advice/Waiver of Rights. Officer Earhart testified he read the Advice/Waiver of Rights form to Broglin before Broglin signed it. Shortly thereafter, Broglin proceeded to incriminate himself. Broglin then acknowledged he was a convicted felon and knew he was not supposed to have firearms. The interview lasted approximately three hours; however, Broglin was permitted to take breaks during the interview and he was provided with beverages. Officer Earhart asked if Broglin would give a written statement but Broglin said something to the effect that he did not write well. Earhart then asked if it would be ok if he put it into writing. Earhart then prepared a written statement. Earhart told Broglin that if he wanted to change anything at any point to let him know. After preparing the written document Earhart read the statement back to Broglin asking him if it was accurate and giving him the opportunity to make changes. Broglin signed each page of the statement. Earhart testified that Broglin's demeanor was friendly, that he had a sincere sense of remorse. He appeared to understand the questions, did not appear to be in any way under the influence and never indicated he did not understand what was going on. Officer Earhart did not raise his voice, there were no threats or promises and at no time did Broglin ask to see an attorney or ask to stop answering questions. Broglin was not arrested the day the search warrant was executed, however, Officer Earhart was aware that Broglin was a convicted felon and had several prior criminal convictions. He was aware that Broglin was over 34 years of age and had a past work history of installing swimming pools and being a journeyman lineman.

---

[1] Broglin has several prior felony convictions.

8

Officer Earhart had also had prior contact with the defendant. In March of 2013, Earhart saw Broglin coming out of the forest and inquired if he was turkey hunting. At that time Broglin had a Mossberg pump shotgun. He spoke with Broglin on that day and testified Broglin seemed to understand what was said to him on that occasion. In January of 2014 there was another occasion for Earhart to meet Broglin. Earhart was conducting a compliant checkpoint and had occasion to ask for Broglin's drivers license and proof of insurance. On that occasion Broglin had been raccoon hunting. Broglin was in possession of a 10/22 caliber rifle with a high capacity magazine. Broglin showed Earhart his hunter education card on that occasion. Once again Broglin appeared to understand what Earhart was saying.

The Defendant called his wife Amanda Broglin as a witness. She testified she had been married to Broglin for 15 years. She testified to the events of July 10, 2014 when the search warrant was executed. There were many armed police officers some of whom were pointing guns and had guns drawn. She and her children were there and she was concerned for them. She was shocked. She said her husband looked shocked and scared. They were worried for their kids who were traumatized. She testified her husband did not read very well at that, that she had to fill out his job application. She presented his high school diploma in special education. She testified he never read a book but had seen him look at a magazine. She conceded his verbal comprehension was better than his reading, but not 100%. She testified he did not use legal words at all but uses basic vocabulary.

The final witness to testify was defendant Broglin. He confirmed his high school diploma was a special education diploma, that he had a reading disorder and could not comprehend much. He has not written anything since high school. When questioned about Officer Earhart asking him some questions he responded he really didn't remember. He

acknowledged he signed a piece of paper that Earhart had read his rights to him but asserted he did not comprehend that. He testified Officer Earhart told him that if he gave a statement it would help him out in court. He confirmed that Earhart wrote out the statement but said he did not read it, but just signed it. However, he confirmed that Earhart read the statement to him before he signed it. On cross examination, Broglin confirmed that he was currently doing power line work for a utility company in Columbus, Ohio. He works 40 hours a week and drives to Columbus, Ohio from Polk County. He testified it took 6.5 hours and was about 400 miles. He has held that job since October and his foreman tells him he is doing a good job. He denied telling Officer Earhart that he knew he did not have a right to have a gun. However, he then conceded that the TBI had told him he could not possess a firearm because he was a convicted felon.

### III. Analysis

Defendant argues the firearms, ammunition and other items found in the house should be suppressed because police entered the house in violation of the Fourth Amendment. Defendant also seeks to suppress his statements made on July 10, 2014 on the ground that they were obtained in violation of his Fifth Amendment rights.

*A. The Firearms, Ammunition recovered in the Home Search – Fourth Amendment Issues*

Defendant contends the search warrant affidavit for his residence was defective because: (1) the information included in the affidavit was stale when the search warrant was issued; and (2) there is an insufficient nexus between the illegal possession of firearms described in the affidavit and his residence. I disagree.

"To establish probable cause adequate to justify issuance of a search warrant, the governmental entity or agent seeking the warrant must submit to the magistrate an affidavit that establishes a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (internal marks and citation omitted). A magistrate's probable cause determination is normally afforded great deference. *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003). In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court adopted a totality of the circumstances test to determine whether an issuing magistrate was presented with sufficient facts for the probable cause determination to issue a search warrant. The Court must consider the totality of the circumstances as set out in the four corners of the affidavit. *Id.* at 236. In other words, the Court's review is limited to the affidavit itself. "The affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000). "An affidavit supporting the issuance of a search warrant should be reviewed in a commonsense, rather than hyper technical, manner to determine probable cause." *United States v. Alexander*, No. 1:13-cr-128, 2014 WL 3557646, at *2 (E.D. Tenn. July 18, 2014) (internal marks omitted). In this case I was the judge who authorized the search warrant. I will again review the affidavit and articulate the reasons why I then thought, as I do now, that there was adequate probable cause to issue the warrant.

*Staleness:*

In determining whether information in a search warrant affidavit was stale, the Sixth Circuit looks to the following factors:

> [T]he character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), the place to be searched (mere criminal forum of convenience or secure operational

11

base?)[.]

*United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998) (internal marks and citation omitted).

"As these variables demonstrate, even if a significant period has elapsed since a defendant's last reported criminal activity, it is still possible that, depending upon the nature of the crime, a magistrate may properly infer that evidence of wrongdoing is still to be found on the premises." *Id*. To that end, "evidence of ongoing criminal activity will generally defeat a claim of staleness." *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001).

Looking at those factors, I conclude the information in the search warrant affidavit for Broglin's residence was not stale when the search warrant was issued. In March 2013, Forest Service Officer Philip Earhart observed Broglin possess a 12-gauge pump shotgun in the Cherokee National Forest. (Search Warrant, at Section IV ¶ 1.) The shotgun was in the front seat of the white Toyota pickup truck Broglin was driving. Officer Earhart physically handled the firearm to determine whether it was loaded. (*Id*.) On January 4, 2014, Officer Earhart observed Broglin possess a Ruger 10/22 semi-automatic rifle, along with a high capacity magazine, in the Cherokee National Forest. (*Id*. at ¶ 2.) The rifle and magazine were in the front seat of the white Toyota pickup truck Broglin was driving. (*Id*.) Tennessee Wildlife Officer Brandon Wear was also present and observed the rifle. Officer Wear physically handled the firearm to determine whether it was loaded. (*Id*.) On January 11, 2014, Officer Wear observed Broglin possess a Ruger 10/22 semi-automatic rifle in the Cherokee National Forest. (*Id*. at ¶ 3.) The rifle was in the front seat of the white Toyota pickup truck Broglin was driving. On January 31, 2014, Officer Earhart learned for the first time that Broglin had several prior felony convictions. (*Id*. at ¶ 4.) On June 27, 2014, Officer Earhart advised Agent Ready that Tennessee Wildlife Officer Ben Davis recently retrieved video footage depicting the January 4, 2014

12

incident.  (*Id*. at ¶ 5.)[2]  On June 30, 2014 and July 1, 2014, Agent Ready confirmed that Broglin

resided at 266 Hawkins Drive in Ocoee, Polk County, Tennessee.  (*Id*. at ¶¶ 6-7.)  Agent Ready

actually traveled to Broglin's residence and observed a white Toyota pickup truck in the

driveway.  (*Id*.)

I conclude this type of information is not stale, given that firearms are not perishable

items.  *See United States v. Lancaster*, 145 F. App'x 508, 513 (6th Cir. 2005); *see also United

States v. Vanderweele*, 545 F. App'x 465, 469 (6th Cir. 2013) (holding that information from

named informant that he witnessed defendant possess a silencer at a motorcycle club seven

months prior to the execution of search warrant at defendant's residence was not stale); *United

States v. Pritchett*, 40 F. App'x 901, 905-06 (6th Cir. 2002) (holding that information from

named informant that he saw firearms at defendant's residence four months prior to the

execution of search warrant at defendant's residence was not stale because "[f]irearms are

durable goods and might well be expected to remain in a criminal's possession for a long period

of time."); *accord United States v. Neal*, 528 F.3d 1069, 1074 (8th Cir. 2008) ("Information that

someone is suspected of possessing firearms illegally is not stale, even several months later,

because individuals who possess firearms tend to keep them for long periods of time.").

Agent Ready noted in his affidavit that, based on his training and experience, "firearms

are not perishable, quickly consumed, or readily destroyed and do not lend themselves as well to

rapid disposition, but are instead of a continuing nature, have an enduring utility to their holders,

and their possession is typically constant and ongoing, often remaining in one person's

possession for a long length of time[.]"  (Search Warrant, Section III(a)-(d).)  Agent Ready

further noted "that persons who possess firearms usually possess other items related to firearms,

---

[2] Officer Davis was also present for this incident.  (*Id*. at ¶ 2.)

such as gun cases, ammunition magazines, holsters, spare parts, cleaning equipment, literature relating to firearms, photographs of firearms and receipts for the purchase of these items." (*Id.*) The Sixth Circuit has consistently upheld search warrants for firearms based on similar language. *Lancaster*, 145 F. App'x at 513; *Vanderweele*, 545 F. App'x at 469; *cf. United States v. Comstock*, 412 F. App'x 619, 622 (4th Cir. 2011) ("Defendant . . . allegedly shot a bear on May 1, 2007. On July 17, more than eleven weeks after the date of the alleged offense, officers obtained a warrant to search his residence. Defendant asserts that officers had no indication that evidence of a crime would still be found at the residence on July 17. . . . In the affidavit attached to the warrant, an officer averred that individuals who purchase firearms retain certain documents relating to those purchases. Indeed, many items referred to in the search warrant, including sales receipts, factory warranties, and cancelled checks are items that one would expect a person to retain at home. Thus, we are persuaded to hold that it was reasonable for the magistrate to believe that such evidence of gun possession would be found at Defendant's residence, notwithstanding the passage of time.").

Furthermore, the illegal firearm possession alleged in the search warrant affidavit was not a one-time occurrence; but rather, a continuous and ongoing offense. *See, e.g., United States v. Goodwin*, 552 F. App'x 541, 545 (6th Cir. 2014) ("Possession of a firearm is a continuing offense that ceases only when the felon relinquishes possession."). The continuing nature of the illegal firearm possession alleged in the search warrant affidavit and the fact firearms have continuing value and an enduring utility to their holders weighs against a finding that the information contained in the search warrant affidavit was stale.

To the extent Broglin claims he was engaged in lawful activity when law enforcement observed him possess multiple firearms on separate occasions, it is not relevant to the issue

14

before me.  As the Government points out, the legislative history surrounding 18 U.S.C. § 922 indicates Congress sought to prohibit even a felon's brief possession of a firearm.  *See, e.g., United States v. Matthews*, 520 F.3d 806, 810 (7th Cir. 2008) (summarizing legislative history).  "The principal purpose of the federal gun control legislation . . . was to [curb] crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'"  *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (citing legislative history).  "Congress sought to divorce completely convicted felons from the use or possession of weapons and from the weapons trade."  *Matthews*, 520 F.3d at 810.  Simply put, Congress concluded that "[g]uns do not belong in the hands of felons."  *United States v. Conle*y, 291 F.3d 464, 473 (7th Cir. 2002).  In other words, Congress did not seek to limit the reach of 18 U.S.C. § 922 to felons who use firearms to commit violent crimes or engage in drug trafficking.[3] There is no "exemption" in 18 U.S.C. § 922 for felons who also use their firearms to hunt.

The fact the search warrant covered Broglin's residence also militates against a finding that the information contained in the affidavit was stale.  *Goodwin*, 552 F. App'x at 546 ("The fact that the place to be searched was Goodwin's home implicates 'a secure operational base,' making the warrant's three-month time span less significant.").  As Agent Ready explained in the search warrant affidavit, "most people who have firearms store them in their homes[.]"  (Ex. B at Section III(a)-(d).)  Broglin's residence was a "secure operational base" where his ongoing criminal activity – illegal possession of firearms – occurred over a span of time.  *See, e.g., Vanderweele*, 545 F. App'x at 469 (noting that people who own firearms generally keep them in their homes).  That law enforcement observed Broglin possess the firearms referenced in the

---

[3] In fact, Congress mandated enhanced penalties for criminals who use firearms to commit violent crimes or engage in drug trafficking, regardless of their criminal history.  *See, e.g.,* 18 U.S.C. § 924(c).

search warrant affidavit outside of his residence does not alter the equation. *Id*.

All of those factors weigh against a claim of staleness. The information contained in the search warrant affidavit established that at the time the search warrant was issued, there was a fair probability that firearms would be found at Broglin's residence.

*Nexus:*

Next, Broglin claims there is an insufficient nexus between the illegal possession of firearms described in the search warrant affidavit and his residence. Once again, I disagree.

As the Government notes, the Sixth Circuit was faced with a strikingly similar scenario in *Vanderweele*. Specifically, a confidential informant told an ATF agent that four to five months earlier he had seen the defendant, James Vanderweele, with a .22–caliber pistol and a silencer at the Rebels Motorcycle Clubhouse in Escanaba, Michigan. 545 F. App'x at 467. Six weeks later, the agent checked Vanderweele's records and found that Vanderweele had three .22–caliber pistols registered to his name, but no silencers. The agent then sought and obtained a warrant to search Vanderweele's house for evidence that he possessed unregistered silencers. During the execution of the search warrant, four silencers, three handguns, a rifle, gun parts, and several boxes of ammunition were seized from Vanderweele's residence. *Id*. A federal grand jury subsequently indicted Vanderweele for possession of unregistered silencers in violation of 26 U.S.C. § 5861(d). *Id*. at 468.[4]

Vanderweele filed a motion to suppress and argued that the search warrant for his residence failed to establish probable cause because it was based on stale information and did not show a connection between the silencers and his home. *Id*. Vanderweele claimed there was an

---

[4] Unlike Broglin, it does not appear Vanderweele was a convicted felon. Vanderweele's crime was simply possession of an unregistered silencer. In fact, Vanderweele had three .22–caliber pistols registered to his name. *Id*. at 467.

insufficient nexus between his possession of the silencer at the motorcycle club four to five months earlier and his home because "the informant only saw him with the silencer at a motorcycle club, and therefore there was no connection between the silencer and his home." *Id.* at 469. The Sixth Circuit disagreed, noting that the ATF agent who executed the search warrant affidavit stated that he was aware, based on his training and experience, "that firearms, ammunition, and related items are commonly stored within the owner or possessor's dwelling." *Id.* The Court further noted that the search warrant affidavit stated that "individuals who own guns keep them at their homes" and that "[a] gun is indeed an apt simile for a silencer, after all, they are complementary goods." *Id.* (internal marks and citation omitted). The Court then concluded that "the magistrate judge had reason to believe that the silencer would be found at Vanderweele's house." *Id.*

Agent Ready stated in his affidavit that "most people who have firearms store them in their homes . . . [and] [t]hat firearms are not perishable, quickly consumed, or readily destroyed and do not lend themselves as well to rapid disposition, but are instead of a continuing nature, have an enduring utility to their holders, and their possession is typically constant and ongoing, often remaining in one person's possession for a long length of time[.]" (Ex. B at Section III(a)-(d).) It is well established that "an issuing judge may infer that a criminal suspect keeps the 'instrumentalities and fruits' of his crime in his residence." *United States v. Williams*, 544 F.3d 683, 688 (6th Cir. 2008). Moreover, Agent Ready's affidavit was based on information provided by multiple law enforcement officers, not unnamed informants, who personally observed Broglin possess multiple firearms in Polk County, Tennessee on separate occasions within six months of the date the search warrant was obtained.

I concluded at the time I authorized the warrant and conclude now that the search warrant

affidavit established a fair probability that firearms would be found at Broglin's residence at the time the search warrant was issued.

   *Good Faith:*

   The Government also submits that the good faith exception to the exclusionary rule counsels against suppression in this casee. I will not address that argument as I find it unnecessary in light of my recommendation.

   *B. Statement of David Broglin - Fifth Amendment Issues*

   Statements made by a suspect while in custody and during an interrogation must be preceded by Miranda warnings in order for those statements to be admissible.[5] *United States v. Crowder*, 62 F.3d 782, 785 (6th Cir. 1995). It is well established that a defendant may relinquish his Miranda rights provided such waiver is voluntary, knowing, and intelligent. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "The waiver must be both the product of a free and deliberate choice rather than intimidation, coercion, or deception and made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Anderson*, 695 F.3d 390, 394 (6th Cir. 2012) (internal marks and citation omitted). "The relevant question is not whether the criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege, but rather whether the suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (internal marks and citation omitted).

   "Under the Fifth Amendment, a suspect is guaranteed the right to remain silent and the right to assistance of counsel during a custodial interrogation." *Toliver v. Sheets,* 594 F.3d 900,

---

[5] The United States does not dispute that Broglin was in custody for purposes of Miranda when he was interviewed by Officer Earhart.

916 (6th Cir. 2010) (citing *Miranda v. Arizona*, 384 U.S. 436, 4444-45 (1966)). The Fifth

Amendment requires *Miranda* warnings be given where a person is subject to custodial

interrogation. *Dickerson v. United States*, 530 U.S. 428 (2000); *Oregon v. Mathiason*, 429 U.S.

492, 494 (1977). In addition, before a person's inculpatory statement can be used against him in

a criminal case, the government must show that the person validly waived his Fifth Amendment

rights. *Miranda*, 384 U.S. at 444; *Bird v. Brigano*, 295 Fed.Appx. 36, 37 (6th Cir. Sept. 30 2008)

(unpublished).

     "To be valid, waivers of Fifth Amendment rights must be 'voluntarily, knowingly and

intelligently' made." *United States v. Montgomery*, 621 U.S. F.3d 568, 573 (6th Cir. 2010)

(quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)); *see also Missouri v. Seibert*, 542 U.S.

600, 608-09 (2004) (The Fifth Amendment requires that a statement or confession be voluntarily,

knowingly, and intelligently given to be admitted into evidence); *accord Dickerson*, 530 U.S. at

433. The government bears the burden to prove by a preponderance of the evidence that the

confession or statements were voluntarily, knowingly, and intelligently given. *Seibert*, 542 U.S.

at 608 n. 1; *United States v. Ostrander*, 411 F.3d 684, 696 (6th Cir. 2005); *United States v. Wrice*,

954 F.2d 406, 410 (6th Cir. 1992).

     Whether a confession was voluntarily given requires inquiry into "'whether a defendant's

will was overborne' by the circumstances surrounding the giving of a confession." *Dickerson*,

530 U.S. at 434 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1973)). In making this

inquiry, the court must consider the totality of the circumstances, "both the characteristics of the

accused and the details of the interrogation." *Dickerso*n, 530 U.S. at 434 (internal citations

omitted). "The determination depends upon a weighing of the circumstances of pressure against

the power of resistance of the person confessing." *Dickerson*, 530 U.S. at 434 (brackets original)

(internal citation omitted). "Coercive police activity is a necessary element for finding that a confession was involuntary." *Abela v. Martin*, 380 F.3d 915, 928 (6th Cir. 2004) (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). Promises of leniency and threats of prosecution may also be forms of coercion which overbear an accused's will and render a confession or statement involuntary. *United States v. Johnson*, 351 F.3d 254, 261 (6th Cir. 2003); *Wrice*, 954 F.2d at 411.

*Voluntariness:*

Broglin claims he did not voluntarily waive his Miranda rights prior to incriminating himself. (Doc. No. 17.) The United States argues the facts and the law mandate a different conclusion.

"While the government bears the burden of proof to show that a waiver of Miranda rights was voluntary, the defendant must first point to some evidence of improper police activity." *United States v. Burke*, No. 1:11-CR-22, 2011 WL 9471904, at *7 (E.D. Tenn. Nov. 30, 2011) (report and recommendation later adopted denying motion to suppress where defendant failed to advance any evidence of coercive police activity). That is to say, a statement can be found involuntary only if it was motivated by coercive government conduct. *Colorado v. Connelly*, 479 U.S. 157, 164-67 (1986). This is because, "[t]he sole concern of the Fifth Amendment, on which Miranda was based, is governmental coercion." *Id.* at 170.

The Sixth Circuit "has established three requirements for a finding that a confession was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).

Based upon the testimony of Officer Earhart, who I found to be a credible witness, I

conclude the evidence and testimony presented at the suppression hearing establishes that

Broglin voluntarily waived his Miranda rights prior to being interviewed by Officer Earhart.

There is no evidence showing his statements to Officer Earhart were the product of coercive

police conduct. I will concede that the execution of a search warrant with the number of officers

involved, as there were in this case, would be a stressful situation and I accept the testimony of

Broglin's wife that it was initially a quite stressful situation. However some time passed after

the initial intrusion, during which time Broglin was in the back seat of the car. The conversation

was in a normal tone and appeared to be friendly. Officer Earhart orally advised Broglin of his

Miranda rights and provided Broglin with a written advisement of rights prior to interviewing

him. Broglin indicated he understood his rights and was willing to speak with Officer Earhart.

The interview took place in an unmarked Forest Service vehicle parked in Broglin's own

driveway. Broglin was in the back seat and Officer Earhart in the front seat. At no point prior to

or during the interview did Officer Earhart display his weapon or raise his voice.[6] Broglin was

permitted to take breaks during the interview and he was provided with beverages. Finally,

Officer Earhart questioned Broglin in a calm and professional manner throughout the duration of

the interview.

I conclude, looking at the totality of the circumstances, that Broglin voluntarily waived

his Miranda rights.

*Broglin's knowing and intelligent waiver of Miranda rights***:**

Broglin also claims he did not knowingly and intelligently waive his Miranda rights prior

---

[6] Broglin was in handcuffs for the duration of the interview. The use of handcuffs, however, does not establish coercion. *See, e.g., United States v. Reese*, 509 F. App'x 494, 501 (6th Cir. 2012) ("Nor does the fact that [Defendant] was handcuffed render his statements involuntary."); *accord Shriner v. Wainwright*, 715 F.2d 1452, 1456 (11th Cir. 1983) ("The use of handcuffs does not establish coercion.").

to incriminating himself.  The United States argues the facts and the law mandate a different conclusion.  I agree.

To determine whether a defendant understood his rights, courts examine the totality of the circumstances, including the suspect's age, experience, education, background, and intelligence.  *United States v. Montgomery*, 621 F.3d 568, 573 (6th Cir.2010).  "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver[.]"  *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

The evidence and testimony presented at the suppression hearing demonstrates Broglin was alert and coherent while he was being interviewed by Officer Earhart and that he understood his Miranda rights prior to waiving same.  Although Broglin appears to have a special education degree and some limitation, perhaps considerable limitation, in his ability to read, the evidence and testimony supports the conclusion that Officer Earhart had no reason to doubt Broglin's understanding of his Miranda rights or his waiver of those rights.  *See, e.g., Garner*, 557 F.3d at 263 (holding that a defendant's comprehension must be measured primarily from the perspective of the police and that a waiver may be invalidated only if the police have a contemporaneous reason to doubt the defendant understood his rights).  Earhart had two prior contacts with Broglin and in neither of those situations did Earhart think Broglin did not understand the interaction between them.

Officer Earhart orally advised Broglin of his Miranda rights and provided him with a written advisement of rights prior to interviewing him.  Broglin indicated he understood his rights and desired to speak with Officer Earhart.  Broglin signed the rights waiver form.  The relevant question is not whether Broglin knew and understood every possible consequence of his

22

waiver. Rather, the question is whether Broglin knew he could choose not to talk to Officer

Earhart, to talk only with counsel present, or to discontinue talking at any time. *Garner*, 557

F.3d at 261. There is no evidence to suggest the oral or written Miranda warnings administered

by Officer Earhart were defective or confusing or failed to provide Broglin with the requisite

information he needed to relinquish his rights. *See, e.g., Brown*, 2011 WL 5170486, at *2

("[T]here is nothing cognitively complex about the Miranda warnings; this is not Heisenberg's

Uncertainty Principle after all but the straightforward advice that one has a right to remain silent

and not to talk to the police.") (internal marks and citation omitted). Broglin was familiar with

the criminal justice system, as evidenced by his multiple prior felony convictions. This suggests

the concept of Miranda was not foreign to him. As the Government argues, there is no evidence

Broglin suffered from any type of mental disease or defect at the time of the interview or was

otherwise unable to understand his Miranda rights and the consequences associated with waiving

them.

After informing a suspect of his Miranda rights, police officers may infer that he has

waived those rights from his subsequent willingness to answer questions, even if he has refused

to sign a written waiver. *Berghuis v. Thompkins*, 560 U.S. 370, 384-86 (2010). Certainly, in this

case, Officer Earhart could reasonably rely on Broglin's oral and written waivers of his Miranda

rights. Defendant is an adult holding a responsible job. He is familiar with the legal system and

his rights. During the entire encounter with police, he was not threatened. No guns were drawn.

Conversations were calm. He was given his *Miranda* rights immediately before he gave his

statement. It was read to him verbatim. He never expressed any reluctance to speak with the

officer. Based on the totality of the circumstances, I conclude there was an intelligent waiver of

his rights.

## IV. Conclusion

For the reasons stated herein, I conclude defendant's Fourth Amendment rights were not violated by entry into his home and that his statement regarding the firearms and ammunition was given after defendant was *Mirandized* and after he knowingly and intelligently waived his Fifth Amendment rights. Accordingly, I RECOMMEND[7] defendant's motions to suppress [Docs. 17 and 18] be DENIED.

S /William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

---

[7]Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).

24